COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Annunziata and Senior Judge Coleman
Argued at Richmond, Virginia


VIRGINIA ALCOHOLIC BEVERAGE
 CONTROL BOARD
                                     MEMORANDUM OPINION[*] BY
v.    Record No. 1982-02-2          JUDGE JAMES W. BENTON, JR.
                                          AUGUST 19, 2003
LITTLE AND TALL, INC. t/a
 ICONS RESTAURANT AND FAHRENHEIT LOUNGE


             FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                       Theodore J. Markow, Judge

             Francis S. Ferguson, Deputy Attorney General
             (Jerry W. Kilgore, Attorney General, on
             brief), for appellant.

             Paul T. Buckwalter, II, for appellee.


     The Virginia Alcoholic Beverage Control Board revoked the

wine, beer, and mixed beverage licenses held by Little and Tall,

Inc., trading as Icons Restaurant and Fahrenheit Lounge.  The

Board determined that "the place occupied by the licensee has

become a meeting place or rendezvous for illegal users of

narcotics and/or habitual law violators, in violation of [Code

§] 4.1–255 2.c."  On review, the trial judge found that the

evidence in the record failed to satisfy the statutory elements

of "meeting place or rendezvous" and, therefore, was insufficient

to establish a violation of the statute.  The Board contends the

trial judge erred in refusing to adopt the Board's interpretation

─────────────
     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

of the statutory terms "meeting place" and "rendezvous."  For the reasons that follow, we affirm the trial judge's order.

I.

At an administrative hearing convened to consider whether Fahrenheit has become a meeting place or rendezvous for illegal users of narcotics or habitual law violators in violation of Code § 4.1-225(2)(c), the evidence established that during an investigation of another licensee, the Board's investigative agents learned that a state police officer's informant said several clubs in the City of Richmond "were known for their drug use and drug dealers that went there and sold [drugs]."  After discussions with the informant, the Board's agents began investigating Fahrenheit, a licensee.  The investigation involved the use of several informants and undercover agents and resulted in an administrative hearing concerning five incidents.

Agent Jama Smith testified that the first event occurred on September 13, 2000 after an informant purchased narcotics from John Cecil Whitehead at another establishment and delivered the narcotics to the agent.  According to Smith, the informant, who was identified only as "Baker" but was not at the hearing, said Whitehead was going to Fahrenheit, where "lots of people were waiting [for] him."  After Smith sent the informant to Fahrenheit with money, the informant "had a conversation" about narcotics with Whitehead inside Fahrenheit.  The informant left Fahrenheit with Whitehead, walked "approximately half a block away," and purchased narcotics from Whitehead in Whitehead's car.  Whitehead testified at the hearing that he did not recall the content of his conversation with the informant inside Fahrenheit, but that

- 2 -

they went to his car because it was too loud inside for him to hear.

Another informant, Gentry, testified that he prearranged with Steve Drumm, a narcotics user and seller, to meet at Fahrenheit on November 1, 2000. As Gentry exited his vehicle that evening to go to Fahrenheit, Drumm approached him on the street. Gentry entered Drumm's vehicle and purchased a narcotic from Drumm. Gentry did not enter Fahrenheit's premises on that occasion.

Gentry also testified that on November 8, 2000 he approached Steven Figg inside Fahrenheit and mentioned he was trying to buy narcotics. Figg said he had cocaine to sell and completed the transaction inside Fahrenheit.

Detective Corrigan testified that he sent an informant into Fahrenheit on December 6, 2000. He testified the informant said he purchased narcotics from a person identified as "Michael." Neither Corrigan nor any other agent observed the transaction.

Gentry testified that on December 9, 2000, he purchased a "small amount" of narcotics from Adam Quaintance near the dance floor in Fahrenheit. Quaintance testified and confirmed that he sold narcotics to Gentry but said the transaction occurred upstairs rather than on the dance floor. Quaintance further testified that he sold narcotics every weekend at Fahrenheit for five to six months and that, although security personnel were generally "all over the place," they were not "upstairs" where he regularly sold narcotics.

The hearing officer found "that [the] evidence establishe[d] reasonable cause to believe that on November 8    . . . ; on

- 3 -

December 6 . . . ; and on December 9 . . . ; illegal drugs were sold by persons to confidential informants inside Fa[h]renheit." He also found that two of the sellers, Whitehead and Quaintance, had engaged in illegal sales inside Fahrenheit and therefore qualify as "habitual law violators." The hearing officer further found that the transactions on September 13 and November 1 did not support the Board's charge. He reasoned that "simply arranging to meet at a licensed establishment as a rendezvous location" is "too tenuous a basis upon which to hold a licensee responsible" when the consummation of the drug purchase occurs off premises. The hearing officer suspended Fahrenheit's wine and beer license for sixty days, or, alternatively, for forty-five days upon payment of a thousand dollar fine. He imposed the same suspension for Fahrenheit's mixed beverage license.

The Board's Enforcement Division requested a modification of the decision and asked the Board to revoke Fahrenheit's licenses. In a Special Notice of Proposed Decision, the Board indicated that the record contained evidence to substantiate the charge as to the September 13 and November 1 incidents. In pertinent part, the notice indicated the following:

> The decision is being modified because (i) the September 13-14, 2000 drug transaction was initiated inside . . . Fahrenheit . . . ; (ii) the November 1, 2000 drug transaction would have taken place at Fahrenheit, which was the meeting place specified by the parties in this transaction, had they not met by chance in a parking lot near Fahrenheit; and (iii) revocation is the appropriate sanction for repeated drug transactions involving Schedule I and II substances at the licensed premises.

- 4 -

After hearing argument, the Board issued the following decision:

> Upon consideration of the record and counsel's arguments, the Board has reasonable cause to believe that the charge is substantiated, certain privileges of the license should be suspended with provision for payment of a civil penalty, the licensee should be placed on probation for three (3) years, and the initial decision should be modified and incorporated by reference as the final decision of the Board. While the Board is relying on all five incidents of drug activity to substantiate the charge, it also concludes that the three incidents originally substantiated by the Chief Hearing Officer, standing alone, are sufficient to substantiate the charge and to justify the Board's decision even without the two additional incidents upon which the Board is also relying in this matter, therefore;

> IT IS ORDERED that the privileges of
> purchasing and selling alcoholic beverages
> granted by the license be, and the same are
> hereby, suspended for sixty . . . days,
> during which period such privileges shall
> not be exercised, the license otherwise
> remaining in force and effect; provided,
> however, that upon payment of a civil
> penalty in the sum of two thousand five
> hundred dollars . . . , the suspension shall
> be terminated at the end of thirty . . .
> days.  Additionally, the licensee shall be
> placed on probation for three . . . years.

## II.

On review, the circuit court judge ruled that the statutory terms "meeting place or rendezvous" necessarily "required prearrangement or predesignation."  The judge also held that the "usage of the term 'meeting place' in Virginia case law carries a necessary implication of predesignation."

The judge found that the evidence in the administrative hearing record established that in three of the five incidents, "the government informant simply went to [Fahrenheit] and proceeded to buy illegal drugs" and that the record is devoid of evidence that the informant had previously arranged to meet with either an illegal user of narcotics or a habitual law violator. Thus, he held that those incidents do not satisfy the prearranged time and place requirement.  As for the remaining two incidents, he noted that one of the two persons involved was an informant and found that "one person cannot meet or rendezvous alone."  He ruled that "a government informant cannot provide an essential element of the charge" and, therefore, the evidence was insufficient to substantiate the statute's "two or more persons" requirement.

- 6 -

Relying upon the hearing officer's detailed findings of fact concerning Fahrenheit's extensive security precautions, the trial judge found that the administrative record contained no evidence that Fahrenheit either knew of the narcotics transactions or had information that would have put a reasonable person on notice of the transactions.  He also noted that the evidence at the administrative hearing proved Fahrenheit "had significant security in place and used reasonable efforts to prevent illegal conduct from occurring on its premises."  Upon his review of the evidence in the record, the trial judge concluded that "there is insufficient evidence in the record that five incidents relied upon by the Board satisfy the 'meeting place or rendezvous' element of Code § 4.1-225(2)c."

                            III.

Code § 4.1-225 provides as follows:

> The Board may suspend or revoke any license
> other than a brewery license, in which case
> the Board may impose penalties as provided
> in § 4.1-227, if it has reasonable cause to
> believe that:
>
>     *     *     *     *     *     *     *
>
> 2.  The place occupied by the licensee:
>
>     *     *     *     *     *     *     *
>
> c.  Has become a meeting place or rendezvous
> for illegal gambling, illegal users of
> narcotics, drunks, prostitutes, pimps,
> panderers or habitual law violators.  The
> Board may consider the general reputation in
> the community of such establishment in
> addition to any other competent evidence in
> making such determination.

The Board contends the trial judge erred by ruling he was

- 7 -

"not bound by the Board's interpretation of 'meeting place or rendezvous.'" Although a long line of cases upholds the general rule that administrative agencies' determinations of matters within their specialized competence are entitled to great weight, see Commonwealth v. General Electric Company, 236 Va. 54, 64, 372 S.E.2d 599, 605 (1988); Winchester TV Cable Company v. State Tax Commissioner, 216 Va. 286, 290, 217 S.E.2d 885, 889 (1975); 1A Michie's Jurisprudence, Administrative Law, § 18 (1993), the Supreme Court has held, however, that "when, as here, the question involves a statutory interpretation issue, 'little deference is required to be accorded the agency decision' because the issue falls outside the agency's specialized competence . . . [and] pure statutory interpretation is the prerogative of the judiciary." Sims Wholesale Co. v. Brown-Forman Corp., 251 Va. 398, 404, 468 S.E.2d 905, 908 (1996) (quoting Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 246, 369 S.E.2d 1, 9 (1988)). Thus, in Sims Wholesale, the Supreme Court "determine[d] the meaning of 'good cause' as used in the [Virginia Wine Franchise] Act." 251 Va. at 404, 468 S.E.2d at 908. Although that Act is "a part of the Alcoholic Beverage Control Act," id. at 400, 468 S.E.2d at 906, the Court rejected the Board's contention that the courts are required to defer to the Board's interpretation of the statutory term. Id. at 404, 468 S.E.2d at 908. The Supreme Court rejected the Board's interpretation of "good cause," rejected this Court's interpretation of "good cause," id. at 405, 468 S.E.2d at 909, and determined the meaning of the term based upon the statutory purpose. Id. at 405-06, 468 S.E.2d at 909.

We are unpersuaded by the Board's argument that the issue in

- 8 -

this case is controlled by ABC Comm. v. York Street Inn, 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979). The crux of the issue in York Street was the construction of the definitions of "table" and "counter," which the Board had included in its regulations. As the Court noted, "[u]pon publication, [Board] regulations 'necessary to carry out the purposes and provisions of' and 'not inconsistent with' the Alcoholic Beverage Control Act 'shall have the force and effect of law.'" 220 Va. at 314 n.2, 257 S.E.2d at 854 n.2 (quoting former Code § 4-11(a)). Thus, the Supreme Court held that it would give special weight to the construction of the definitions of "table" and "counter" because the Board, pursuant to statutory authorization, "ha[d] promulgated regulations prescribing certain standards for a licensee's equipment and furnishings." 220 Va. at 314, 257 S.E.2d at 854. In the present case, however, as in Sims Wholesale, the issue is solely a matter of statutory interpretation of terms with no specialized connotation. "The issue does not involve 'the substantiality of the evidentiary support for findings of fact, which requires a great deference because of the specialized competence of the agency." 251 Va. at 404, 468 S.E.2d at 908. See also Yamaha Motor Corp. v. Quillian, 264 Va. 656, 665-66, 571 S.E.2d 122, 126-27 (2002) (reiterating that the Court's duty is to determine legislative intent from the words of the statute and the Court is not bound by the agency's interpretation of the statute). The record does not indicate that the Board used its regulation or rule-making authority to attach any special significance to the terms "meeting place" or "rendezvous." Hence, the trial judge correctly ruled that the Board's application of the terms is not

binding on the reviewing courts.

The record establishes that the hearing officer found, in essence, that

> the place occupied by the licensee has become a meeting place or rendezvous for illegal users of narcotics and/or habitual law violators . . . [because] the evidence establishes reasonable cause to believe . . . illegal drugs were sold by persons to confidential informants inside Fahrenheit . . . [and] [t]wo of these drug dealers . . . also engaged in other sales of illegal drugs inside the licensed establishment.

The Board expanded the scope of the statute to include a "drug transaction [that] was initiated inside . . . Fahrenheit" but consummated outside and a "drug transaction [that] would have taken place at Fahrenheit . . . had [the parties] not met by chance in a parking lot near Fahrenheit."

The trial judge rejected the Board's conclusion that the statutory terms "meeting place" or "rendezvous" could be established by the mere showing that two people met at a place and there consummated a drug transaction.  In so doing, he relied upon the usual dictionary definitions of the words that require prearrangement or predesignation.  For example, the American Heritage Dictionary of the English Language 1477 (4th ed. 2000) defines rendezvous as: "1. A meeting at a prearranged time and place.  2. A prearranged meeting place, especially an assembly point for troops or ships.  3. A popular gathering place."

Moreover, in view of the statutory language, the trial judge appropriately sought to define contextually the terms "meeting place" or "rendezvous."  We note that Webster's Third New International Dictionary 1922 (1993) similarly defines

- 10 -

"rendezvous," in the context of an establishment, as "a place appointed for assembling or meeting" and "a place to which people customarily come in numbers: a place of popular resort: HAUNT." In short, as the trial judge ruled, the element of prearrangement or predesignation necessarily exists to account for the presence of assembled persons.

Indeed, Virginia courts have generally used the terms "rendezvous" and "meeting place" as if they require prearrangement or predesignation by the parties involved. Minus a few exceptions, whenever our decisions use the word "rendezvous" as a noun, an element of predesignation for an assembly was evident. See, e.g., Miller v. Commonwealth, 181 Va. 906, 907-08, 27 S.E.2d 57, 57 (1943) (noting that the "rendezvous" for "the gathering of . . . persons, young and old, who were on pleasure bent . . . were two night clubs"). Cf. Virginia R. Co. v. London, 148 Va. 699, 708, 139 S.E. 328, 330 (1927) (noting "that the rear of [a] barn was a rendezvous for bootleggers and other disrepute persons who drank and smoked there"). Likewise, the element of predesignation for a gathering is implied in decisions using the word "meeting" and "place." See e.g. Roanoke City School Bd. v. Times World Corp., 226 Va. 185, 192, 307 S.E.2d 256, 259 (1983) (noting that "'[m]eeting' is defined . . . as 'an act or process of coming together . . . a gathering for business, social, or other purposes"); Thomas v. Commonwealth, 263 Va. 216, 222, 559 S.E.2d 652, 654 (2002) (parties agreed on an "arranged meeting place").

Under accepted principles, in construing the terms in the Act, we must consider the words used, their relation to the

- 11 -

subject matter in which they are used, the purposes for which the act was intended, and such other sources, if any, as may throw light upon the intention of the legislation. Miller v. Commonwealth, 172 Va. 639, 2 S.E.2d 343 (1939). Thus, we agree in substantial part with the trial judge's interpretation of the statutory terms.

By referencing a reasonable cause to believe the establishment "[h]as become a meeting place or rendezvous" for illegal activities, the statute contemplates more than a private arrangement by two people to meet at a place and there secretly conduct a transaction. Indeed, if it did not, no licensee using reasonable and prudent means could safely manage its business or protect against a violation. The statute very obviously suggests a broader definition of the terms because it provides that "[t]he Board may consider the general reputation in the community of such establishment." Code § 4.1-225(2)(c). Read in its entirety, the statute prohibits a known usage of the establishment for the proscribed purposes. Thus, we hold that to establish a violation of Code § 4.1-225(2)(c), the evidence must prove the establishment has become a place of gathering or assembly, whether by prearrangement or reputation, for persons engaged in the proscribed acts. Accordingly, we hold, as did the trial judge, that in order to prove Fahrenheit violated Code § 4.1-225(2)(c), the evidence must further prove that two or more illegal users of narcotics or habitual law violators used it as a meeting place or rendezvous. The rationale behind this rule is twofold. First, it is impossible to meet or rendezvous alone. Second, the language of the statute demands it. The statute

prohibits an establishment from becoming a meeting place or rendezvous for "illegal use<u>r</u>s" of narcotics or "habitual law violato<u>r</u>s."  Code § 4.1-225(2)(c) (emphasis added).

Applying these principles to the present case, we hold that the trial judge did not err in concluding that the evidence in the record fails to substantiate the charge that Fahrenheit violated Code § 4.1-225(2)(c).  In three of the five incidents, it was not proved that the informants prearranged with the sellers to meet at Fahrenheit.  In those incidents, the government informant simply entered Fahrenheit and, during the evening, bought illegal drugs.  No evidence was offered to prove an illegal user of narcotics or a habitual law violator had previously arranged to meet with another illegal user of narcotics or habitual law violator.

Likewise, the evidence failed to prove prearrangement in the incident involving Baker and Whitehead.  In that incident, Whitehead simply made a statement that he was going to Fahrenheit, and Smith testified at the hearing that "[t]here was no arrangement made between Mr. Baker and Mr. Whitehead that [they] would meet . . . at Fahrenheit's."  For the purpose of this opinion, however, because no evidence proved more than one illegal users of narcotics or habitual law violators had used Fahrenheit as a meeting place or rendezvous, it is irrelevant whether prearrangement occurred.  The incident involving Baker and Whitehead cannot substantiate the charge because, even though Whitehead was deemed to be a habitual law violator, no evidence establishes Baker as either an illegal user of narcotics or a habitual law violator.

In the incident involving Gentry and Drumm, the evidence established that they never entered Fahrenheit. Code § 4.1-225(2)(c) prohibits an establishment from becoming a meeting place or rendezvous; it does not encompass the public area surrounding the establishment or Drumm's vehicle. The express language of the section, no matter how strictly construed, cannot reach locations that are not described in the statute and are outside of the licensee's control.

The Board's attempt to revoke Fahrenheit's licenses reflects the Board's intention to combat illegal drug activities in licensed establishments. The General Assembly likewise shares that intention. Consequently, in a recent amendment to Code § 4.1-225(2)(c), the General Assembly added language to prohibit a licensed establishment from becoming "a place where illegal drugs are regularly used or distributed." 2003 Va. Acts, ch. 594. "As a general rule, a presumption exists that a substantive change in law was intended by an amendment to an existing statute." Commonwealth v. Bruhn, 264 Va. 597, 602, 570 S.E.2d 866, 869 (2002). Furthermore, "we will assume that . . . amendments to the law are purposeful and not unnecessary or vain." Cape Henry Towers, Inc. v. National Gypsum Co., 229 Va. 596, 600, 331 S.E.2d 476, 479 (1985). Thus, we note that the additional language is not meant to be redundant. This statutory change avoids the conclusion that the Board now must prove an element of prearrangement inherent in "meeting place" and "rendezvous" when drugs are "regularly used or distributed." The version of the statute at issue in the present case, however, prohibited an establishment from becoming known in a generalized

way, connected with the concepts of "rendezvous" and "meeting place," a place where proscribed persons assembled.

For these reasons, we affirm the trial judge's order.

<u>Affirmed</u>.